**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**


UNITED STATES OF AMERICA          :

                                  :

        v.                        :

                                  :  Crim. No. 3:02-cr-00072 (AWT)

NEGUS THOMAS                      :



**ORDER DENYING MOTION FOR SENTENCE**
**REDUCTION UNDER THE FIRST STEP ACT**

    Defendant Negus Thomas has moved for a sentence reduction.
He initially filed a motion for resentencing under section 404
of the First Step Act, based on application of the Fair
Sentencing Act, and then added a request for relief in the
alternative under section 603 of the First Step Act, commonly
referred to as "compassionate release". For the reasons set
forth below, his motion for sentence reduction (ECF Nos. 721,
750) is hereby DENIED.



                              I

    On May 13, 2003, after a two-week trial, defendant Negus
Thomas and co-defendant Jerkeno Wallace were convicted on
charges related to a crack cocaine conspiracy lasting from May
16, 2001 until March 11, 2002 and the related murder of Gil
Torres on May 16, 2001.  As reflected in the Judgment, Thomas

was found guilty of the following offenses charged in the
Superseding Indictment:

> **Count 1:** Conspiracy to Possess with Intent to Distribute, and to Distribute, 50 Grams or More of Cocaine Base, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(iii).

> **Count 4:** Possession with Intent to Distribute, and Distribution of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

> **Count 10:** Maintaining an Unlawful Drug Distribution Location, in violation of 21 U.S.C. § 856(a)(2).

> **Count 11:** Conspiracy to Use a Firearm During a Drug Trafficking Offense and During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(o).

> **Count 12:** Drive-by Shooting, Murder, and Aiding and Abetting, in violation of 18 U.S.C. §§ 36(b)(2)(A), 1111(a), and 2. (The jury found that Thomas was guilty of First-Degree Murder.)

> **Counts 13 and 14:** Use of a Firearm During and in Relation to a Drug Trafficking Offense and During and in Relation to a Crime of Violence, and Aiding and Abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1), and 2. (The conviction on Count 13 was vacated following the determination on appeal that Counts 13 and 14 were multiple convictions for a single unit of prosecution.)

"The United States Attorney General did not authorize the Government to seek the death penalty in this case.  Thus the maximum penalty [was] life imprisonment."  Presentence Report ("PSR") (ECF No. 723-1) n.2. Thomas was sentenced on December 12, 2003, as follows:

> Count 1, life imprisonment

> Count 4, 240 months

Count 10, 240 months

Count 11, 240 months

Count 12, life imprisonment

Counts 13 and 14, 120 months (consecutive)

As reflected by the fact that the beginning date for the conspiracy charged in Count 1 was the date on which Gil Torres was murdered, that murder was the impetus for the investigation of people involved in the narcotics conspiracy. See PSR at 10 of 25 ¶ 35. The evidence presented by the government at trial concerning the murder of Gil Torres included the following:

> On May 16, 2001, shortly before 3:00 p.m., as Millicent Bartney stepped from her residence at 68 Edgewood Street to greet her son at the bus stop near the intersection of Albany Avenue and Edgewood Street, she looked across the street and saw that two Puerto Rican males were robbing Negus Thomas. Bartney testified that Thomas was on the ground as his assailants pointed a gun at him. Bartney also saw that Thomas' long-time friend, Jerkeno Wallace, came to the area of the robbery with his pit bull in an attempt to help Thomas. Bartney saw Wallace stop when one of the assailants pointed the gun at Wallace and his dog. Bartney then saw Thomas get up from the ground and run up Edgewood Street toward Albany Avenue and 81-83 Edgewood Street.
>
> Bartney has known Thomas for most of his life, and on May 16, 2001, Thomas and Wallace lived upstairs from her at 68 Edgewood Street.
>
> Bartney quickly retreated into her apartment and called 911. The HPD recorded the call at 2:59:55 p.m. . . . Bartney testified that at no point did she hear Jerkeno Wallace go up the stairs to his residence after the robbery . . . .

Ms. Bartney's testimony about the robbery was corroborated by Lorenzo Martinez and Josie Torres, each of whom admitted that on May 16, 2001, they used a gun to rob a drug dealer on Edgewood Street. More specifically, Martinez explained that he stole approximately 5 grams of crack cocaine from a diminutive drug dealer while his cousin, Gil Torres, waited in their car (a Honda Prelude) and his other cousin, Josie Torres, protected them from a second person who had a pit bull. . . .

Josie Torres confirmed that he and Martinez committed the robbery. In addition, Torres identified Negus Thomas as the drug dealer and Jerkeno Wallace as the dealer's associate who had the pit bull. Torres also estimated that the shooting occurred within minutes of the incident on Edgewood Street.

With respect to the murder of Gil Torres, Martinez and his cousin, Josie Torres, both explained that after they drove from Edgewood Street, they were unaware of any danger. They traveled a short distance and stopped at a red light on Farmington Avenue near the Mark Twain House and Hartford Public High School. Suddenly, their Honda Prelude came under fire: the rear window of the Prelude was blown out; at least two bullets entered the vehicle and lodged in the car; and Gil Torres was shot. He slumped over the steering wheel and the Prelude careened forward, violently colliding with a school bus on the other side of the street. The Medical Examiner, Dr. Carver, testified that Torres was hit by two bullets. One of these bullets lodged in Torres' spine at the base of his neck, paralyzing him instantly and ultimately killing him.
. . . .

Kimberly Cruze and Peter Pitter also testified at trial. In addition to explaining their knowledge of the crack distribution occurring on Edgewood Street (discussed below), each testified as to the events of May 16, 2001.

4

Cruze testified that she lived on the first floor apartment of 81-83 Edgewood Street . . . .

With respect to the events of May 16, 2001, Cruze testified that shortly before 3:00 p.m., she was in the front yard area of 81 Edgewood Street. She recalled seeing a blue Buick that she associated with Thomas parked in her driveway. Cruze went into her first floor residence . . . . A few minutes later her daughter, age 16, came into the residence and told her that Thomas had been robbed. Cruze recalled that she went outside a few minutes later. She did not see Thomas. She also noticed that the Buick was gone from the driveway. Sometime later, Cruze saw Thomas and Wallace in front of her house. Cruze asked Thomas what had happened, and he responded, "watch the news."

Peter Pitter also testified about the events of May 16, 2001. . . . Pitter explained that as he stood on the front lawn of 81 Edgewood Street, he saw Thomas flag down a small car and approach the vehicle in order to make a crack cocaine sale. Pitter then went upstairs to the second floor porch at 81 Edgewood Street. At that point he saw two large Puerto Rican males leave the car and point a gun at Thomas, who was forced to the ground.

As Pitter observed this incident, he initially thought that undercover police officers were arresting Thomas. Pitter realized his mistake, however, when he saw Thomas run from the robbers, who in turn sped off in their small car. As Thomas ran into the front porch area of 81 Edgewood Street, he shouted to Pitter, "did you see them rob me?" By Pitter's estimate, Thomas remained inside the residence for about twenty seconds. Pitter then saw Thomas hurry over to the Buick that was parked in the driveway; Thomas was clutching an item in his pant pocket that had not been there when he ran from his assailants.

Approximately twenty-five minutes later, Pitter observed the Buick return and park across the street. Thomas was driving. Wallace exited the passenger side of the car and, from Pitter's

> perspective, appeared to have something in his
> hands, which was concealed under the front of his
> shirt. Wallace went into 81 Edgewood Street for a
> few minutes before returning to the front of the
> house. When Pitter asked what had happened, Wallace
> ultimately stated that "we caught up to them over
> by the high school."

PSR at 6-10 of 25 ¶¶ 15-20, 27-28, 30-32 (footnotes
omitted).

As to the victim of the first degree murder, as
summarized in the government's sentencing memorandum,
"Gil Torres was paralyzed instantly from the bullet that
ripped into his spine. He expired the next day, after his
respiratory system failed."  Gov't's Mem. in Aid of
Sentencing (ECF No. 522) at 3. At the time of his death,
Gil Torres was married to the mother of his two children.
Victim impact letters were sent to his wife and his
mother.

The government also presented extensive evidence
concerning crack cocaine trafficking at 81-83 Edgewood
Street, which is also summarized in the Presentence
Report.  See PSR at 10-11 of 25, ¶¶ 34-41.


## II

Under section 404 of the First Step Act, "[a] court that
imposed a sentence for a covered offense may, on motion of the
defendant, the Director of the Bureau of Prisons, the attorney

for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed." First Step Act of 2018, Pub. L. No. 115-391, § 404(b), 132 Stat. at 5222.

Also, the First Step Act amended, inter alia, § 3582(c)(1)(A) of Title 18 of the United States Code.  That provision requires as an initial matter that

> the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . .

18 U.S.C. § 3582(c)(1)(A).  Assuming a defendant has exhausted administrative remedies, a court may reduce a term of imprisonment under § 3582(c)(1)(A)(i) if, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, the court finds that "extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission".  18 U.S.C. § 3582(c)(1)(A)(i).  In making this determination courts should "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.  Neither Application Note 1(D), nor anything else in the now-outdated version of Guidelines § 1B1.13, limits the

district court's discretion."   United States v. Brooker, 976
F.3d 228, 237 (2d Cir. 2020).

Thomas has satisfied the requirement with respect to
exhaustion of administrative remedies.


### III

Thomas is currently serving concurrent life sentences for
Counts 1 and 12, the crack cocaine conspiracy and the first-
degree murder. He contends that:

> Extraordinary and compelling circumstances exist that
> warrant a reduction in sentence pursuant to the
> compassionate release statute, 18 U.S.C. §
> 3581(c)(1)(A)(i). Mr. Thomas recently suffered a life-
> threatening stroke, leaving his ability to care for himself
> in a prison setting significantly diminished and prompting
> USP Canaan to admit that they were "unable to manage" Mr.
> Thomas' condition. Furthermore, Mr. Thomas' history of
> stroke as well as other chronic medical conditions,
> including high blood pressure and high cholesterol, put him
> at significantly increased risk of suffering acutely from
> COVID-19, should he contract the virus. Moreover, Mr.
> Thomas has shown substantial and exceptional rehabilitation
> throughout the past 20 years while incarcerated. Mr. Thomas
> respectfully submits that the combination of those
> extraordinary and compelling circumstances warrants a
> sentence reduction to time served coupled with a lengthy
> term of supervised release.

> Alternatively, if the Court denies Mr. Thomas'
> compassionate release request, Mr. Thomas seeks prompt
> resentencing under section 404 of the First Step Act. Mr.
> Thomas was sentenced to life in prison at age 26 for his
> role in a crack cocaine conspiracy, a "covered offense"
> under section 404 of the First Step Act, and his role in
> the murder of Gil Torres. Today, he is 43 years old and has
> been incarcerated for approximately 222 months, or more
> than 18 and a half years. After accounting for good conduct
> time, Mr. Thomas has served the equivalent of a sentence of

approximately 255 months, or more than 21 years. This Court
has never had the opportunity to consider Mr. Thomas' post-
sentencing conduct and determine whether a life sentence is
greater than necessary to serve the purposes of sentencing
for him.

Def.'s Mem. in Supp. (ECF No. 750) at 1-2.

With respect to section 603, the defendant maintains that
his "medical conditions support his contention that he is at
risk for suffering acutely from COVID-19 should he contract the
virus." Response to Gov't's Opp'n (ECF No. 759) at 3.  In this
regard, he makes several points.  First, he states that
"Hypertension and a history of strokes, both of which Mr. Thomas
suffers from, may increase a person's risk of COVID-19,
according to the Centers for Disease Control ("CDC")."  Id.  As
an initial matter, as noted by the government in its opposition,
guidance from the CDC now makes "the distinction between known
risk factors and those that only 'may' or 'might' increase
risk." Gov't's Mem. Opposing Compassionate Release (ECF No 757)
at 18 of 33.  Thus, as further noted by the government,

> The CDC's website states that certain "serious heart
> conditions"—heart failure, coronary artery disease,
> cardiomyopathies, and pulmonary hypertension—"increase[]
> your risk of severe illness from COVID-19," while "other
> cardiovascular or cerebrovascular disease, such as
> hypertension (high blood pressure) or stroke, may increase
> your risk of severe illness from COVID-19."

Id.

Moreover, the defendant's medical records reflect that he
appears to have recovered from his stroke except for the

possible need for ongoing speech therapy.  On July 6, 2020, the

defendant suffered a stroke that required his immediate transfer

to a local hospital and emergency surgery.  The surgery was

successful, and the defendant remained at the hospital for three

weeks.  A medical note on July 15, 2020, stated that the

defendant "needs transfer to medical facility".  ECF No. 755 at

2 of 4.  It also indicated that

> He needs on going therapies on a [daily] basis that are not
> available at my institution. It is unlikely he will return
> to pre CVA level of functioning but needs intensive therapy
> to be certain. Pt would be unsafe to return to a maximum
> security penitentiary in this condition.

Id.  In an administrative note also dated July 15, 2020, the

defendant's doctor noted that he had spoken to the nurse, and

"[e]xplained that we are trying to get him transferred to a

facility that was better able to care for him.  We are unable to

manage him in this condition at Canaan."  ECF No. 752 at 29 of

169.

However, on July 27, 2020, the same doctor put in a note

that the defendant was

> still improving, most of the right sided weakness has
> resolved, he still has some word finding difficulty, he is
> still seeing speech and occupational therapists but has
> been d/c from physical therapy.

ECF No. 752 at 20 of 169. The next day the same physician put in

a note that the defendant was

> doing better all the time, physical therapy says he almost
> 100% with regards to previous weakness, he is still getting

> speech therapy, spoke with therapist and she stated he
> should continue with some speech therapy, still with some
> word finding difficulty, substitution of the wrong letter
> like Ball for fall, needs to be coached to slow down his
> speech so he can process better.

ECF No. 752 at 19 of 169.

On July 29, 2020, the doctor entered a note reflecting that

> he is able to do all ADLS, feeding, bathing, walking,
> dressing but is still struggling some with word finding.
> Discussed with speech therapist at Wayne and plan to try
> and get him discharged with f/u as outpatient for ongoing
> speech therapy.

ECF No. 752 at 18 of 169.

On August 7, 2020, the comment in the defendant's medical

records recommended that the defendant not be transferred to

another institution.  It reads: "Recommend denial with continued

local management. He is independent with ADLs and has returned

to the institution."  ECF No. 755 at 4 of 4.  Of particular

significance is the fact that the comment also reflects that the

defendant was refusing speech therapy:

> While he does continue to require speech therapy it is
> recommended for twice weekly for 90 days. He is currently
> refusing speech therapy.

Id.  The request for a transfer was denied on September 14,

2020.

Thus, while the defendant's condition a little over a week

after his surgery during the first week in July was such that

his doctors thought it could not be managed appropriately at

Canaan, by the end of the month the defendant's condition had

improved significantly and in early August it was determined
that he could remain at Canaan.

With respect to the defendant's hypertension, as documented
by the government in its opposition, it "does not appear
severe", his "hospital records indicate that he received blood
pressure medication when he needed it, and that the medication
was subsequently discontinued", and "the hospital consistently
determined Thomas's blood pressure to be 'stable' and
'satisfactory.'"  ECF No. 757 at 19 of 33.  With respect to high
cholesterol and anemia, the defendant concedes that neither is a
COVID-19 risk factor.  He has received medication for the high
cholesterol and although he has a history of anemia, he is
receiving no current medical treatment for it.

Finally, the defendant highlights the fact that he "has a
BMI of 26, which puts him squarely within the range of possible
risk", because the CDC has warned "that people who are
overweight, defined as a Body Mass Index ("BMI") between 25 and
30, may be at increased risk for suffering from COVID-19."  ECF
No. 759 at 3.

The defendant maintains that "[a]ll of his medical
circumstances, particularly when taken together, quite clearly
increase his risk for suffering acutely from COVID-19."  Id.
However, in January 2021 the defendant tested positive for
COVID-19 but denied any symptoms of COVID "such as cough, sob,

GI symptoms".  ECF No. 769 at 2 of 2.  Then he was placed in

isolation status and monitored for symptoms for ten days in

accordance with the institution's protocol.  Thus, the

defendant's testing positive for COVID-19 was readily managed by

the institution and without any acute suffering on his part.

Based on the foregoing, the court concludes that the

defendant's medical conditions, even when taken together, do not

constitute an extraordinary and compelling reason to reduce his

sentence.

The defendant maintains that such an extraordinary and

compelling reason does exist if the court also takes into

consideration his "substantial and exceptional rehabilitation".

ECF No. 750 at 1 of 59.  The court does not agree.  For the

reasons set forth below with respect to the request for relief

under section 404, the court concludes that reduction of the

defendant's sentence is not appropriate here even if one takes

into account the defendant's efforts in terms of rehabilitation.

With respect to section 404, the parties are in agreement

that Count 1 is a "covered offense." They disagree about whether

Thomas is eligible for resentencing on Count 12.

The defendant maintains that because he was convicted of a

covered offense he is entitled to resentencing on all counts of

conviction.  The government maintains that:

reducing a sentence imposed for a non-covered offense on
the basis that the defendant is also serving a sentence
imposed for a covered offense is arguably inconsistent with
[United States v. Martin, 974 F.3d 124 (2d Cir. 2020).]

ECF No. 757 at 29 of 33.  The government maintains further that

"[t]his Court need not address the issue because [the court] . .

. should conclude[] that Thomas's first degree murder conviction

independently supports his life sentence." Id.

Count 12 of the Superseding Indictment charged that the
first-degree murder was committed "in furtherance of a major
drug offense." Superseding Indictment (ECF No. 186) at 8 of 9.
That major drug offense was the offense charged in Count 1.

In United States v. Reed, 7 F.4th 105 (2d Cir. 2021), the
court held that

a sentence arising from a multi-object conspiracy
conviction involving a crack cocaine object, with a
statutory penalty provision under 21 U.S.C. §
841(b)(1)(A)(iii) or 21 U.S.C. § 841(b)(1)(B)(iii), is a
"covered offense" under Section 404 that is eligible for a
sentencing reduction . . . .

Id. at 110. As part of the explanation of its holding, the
court stated:

Put simply, under the text of the First Step Act, a multi-
object conspiracy offense is a "covered offense" if either
21 U.S.C. § 841(b)(1)(A)(iii) or 841(b)(1)(B)(iii) was
triggered by the drug-quantity element of an object of that
conspiracy offense.

Id. at 113.

Following the reasoning in Reed, the court in United States
v. Sumler, No. 95-154-2 (BAH), 2021 WL 6134594 (D.D.C. Dec. 28,

14

2021), concluded that a defendant's conviction for RICO conspiracy is "covered offense." The court stated:

> Thus, the fact that defendant would have been subject to life imprisonment on the RICO conspiracy offense—regardless of any changes implemented by the Fair Sentencing Act and even absent the predicate crack offenses—because of the CCE murder conviction, has no bearing on the determination of whether the conspiracy offense is "covered" within the meaning of Section 404(a).

Sumler, 2021 WL 6134594, at *12.

However, in United States v. Allen, the court reached the opposite conclusion after analyzing "whether Defendant's conviction for a RICO conspiracy, in violation of 18 U.S.C. § 1962(d), constitutes a covered offense under the First Step Act." No. 3:03CR394 (DJN), 2022 WL 2124495, at 5 (E.D. Va. June 13, 2022), aff'd sub nom. United States v. Allen, No. 22-6746, 2023 WL 3050985 (4th Cir. 2023). One of the underlying predicates in that case involved the distribution of crack cocaine. The court concluded that the RICO count was not a covered offense. It stated:

> [T]he Fair Sentencing Act did not change the statutory penalty range for an aggravated RICO conspiracy. That a covered offense could have formed the predicate for the fourth element does not change the analysis. . . . To the extent that drug offenses form the predicate of a RICO conspiracy, the RICO charge does not "turn on the punishment" for the drug offenses. Rather, the RICO charge turns on the conduct underlying the drug offenses — the commission of a drug offense. . . . . The element that includes the racketeering activity does not turn on the type or quantity of drug like the elements of the drug offenses do. Instead, 18 U.S.C. § 1963 controls the punishment, not 21 U.S.C. § 841(b). And, although the Fair

15

> Sentencing Act modified the statutory penalties for 21
> U.S.C. § 841(b), it left the statutory penalties for 18
> U.S.C. § 1963 unaltered.

Id. at *8. See also United States v. Randolph, No. 3:01CR304-11, 2022 WL 17170850 (E.D. Va. Nov. 22, 2022).

Of course, Reed is not directly on point, and neither is Sumler or Allen, because a different offense is at issue here. However, the court finds the analysis in the concurring opinion in Reed to be helpful, and it is unclear to the court whether the reasoning in that concurring opinion should be extended by analogy to Count 12. Because the court's ultimate conclusion in this case is that, on balance, the § 3553(a) factors weigh decisively against resentencing the defendant, the court assumes for purposes of the instant motion that Count 12 is a "covered offense."

The defendant maintains that his

> incredible commitment to rehabilitation over the last 20
> years is an extraordinary and compelling circumstance that,
> when taken together with the other circumstances, warrants
> a reduction in sentence. Although rehabilitation alone is
> not a sufficient ground for a reduction in sentence, it
> certainly is a factor that can, and should, be considered.

ECF No. 750 at 34.  He observes that he has spent the years since he was sentenced in 2003 "not only bettering himself, but also helping others, both in and out of prison, to do so as well." Id. at 35.

16

With respect to bettering himself, it is undisputed that the defendant has devoted significant time to education, "including nearly 1,000 hours of courses, receiving his GED, and taking more than 30 other classes". <u>Id.</u>  He states that "[h]e has focused much of his educational programming on addressing the root issues of his criminal behavior: lack of financial resources, lack of paternal guidance, and flawed decision-making." <u>Id.</u>  The defendant maintains that "[h]e has also been a model inmate—reliable, trusted, and respected—which is a significant indicia of rehabilitation." <u>Id.</u> at 36.  Five individuals who are also inmates at Canaan have submitted letters of support on behalf of the defendant, attesting to mentorship he has provided those individuals and explaining how he has been a positive influence on them by, for example, helping them change their way of thinking for the better. <u>See e.g.</u> Al'Rashon Brown Letter (ECF No. 771-2) at 2 of 2.

The letters from the defendant's brother and the defendant's daughter attest to the defendant's efforts and accomplishments in terms of starting

> King & Queen Publishing Company which "was founded to give black men and women across the country a platform to release unpublished creative arts and to provide an opportunity to the men and women that are incarcerated to become official authors to share their writings with the world.

Def.'s Mem. in Supp. Suppl. (ECF No. 771) at 4.

Lenore Anderson is the founder and president of Alliance for Safety and Justice, a nonprofit advocacy organization working to improve our safety and justice systems.  She has become familiar with the defendant because the defendant's younger brother, Aswad Thomas, runs one of the Alliance's programs, Crime Survivors for Safety and Justice.  She and Aswad Thomas both attest that they rely on the defendant as an informal advisor to help in the development of their work and that the defendant has provided valuable input.

The defendant points to his "mostly clean disciplinary record over the last 20 years [as] also support[ing] a conclusion that he is not likely to reoffend. . . . [A]lmost all of Mr. Thomas' few disciplinary infractions stemmed from his use of marijuana, which he largely used as a coping mechanism, particularly after" his brother was shot.  ECF No. 750 at 41 (internal citations omitted).

The defendant observes that "[t]he Court in each sentencing underscored the correct conclusion at the time that Mr. Thomas was a threat to society."  ECF No. 759 at 6.  The defendant maintains that "[t]hose realities have changed completely."  Id. The government recognizes that "Thomas's efforts to rehabilitate and to use his experiences to help others is truly commendable," but it expresses the following note of caution with respect to any conclusion that he is no longer a threat to society:

Weighing heaviest against the notion that Thomas poses no danger is his conduct outside the controlled environment of prison. Thomas was the leader of a brazen and long-running crack trafficking operation. He used a minor as part of that operation. In furtherance of the operation, he and Jerkeno Wallace executed Gil Torres via drive-by shooting near a school as class was letting out for the day. Bullets fired from Thomas and Wallace's vehicle instantly paralyzed Torres, who lost control of his vehicle and accelerated it into nearby cars before it slammed into a school bus across the street. Thankfully, no children or other innocents were harmed during this horrific sequence—a risk no doubt far from the minds of Thomas and Wallace when they chose to exact revenge on Torres in broad daylight near a high school. After a jury found Thomas guilty of these crimes, he convinced a trial witness to draft a letter that falsely recanted testimony and then submitted that false letter with a motion for a new trial. In short, when free in the community, Thomas was a violent and unrepentant crack dealer who committed extremely serious crimes that ruined lives, most obviously those of Gil Torres and his family, but also those whose crushing addictions were fueled by Thomas's flagrant drug trafficking.

ECF No. 757 at 24 of 33.

There was a four-level adjustment for role in the offense with respect to the defendant because he was indisputably the organizer and leader of the drug conspiracy.  There is a reference in a government memorandum to the defendant convincing a trial witness to draft a letter that falsely recanted testimony.  The details of that conduct are discussed in the United States' Response to Defendants' Motions for Judgment of Acquittal and for New Trial.  See ECF No. 512 at 34-41. At one point in its discussion of this situation the government correctly observed:

19

In this trial, the Court clearly witnessed the fear that
Thomas and Wallace inspired in those who lived on Edgewood
Street. Having now been sentenced, [recanting witness]
undoubtedly feels concern for his own safety and that of
his family members who remain in the Edgewood Street area.

Id. at 40.  During the trial, the court did clearly witness such
fear.

The court agrees that the defendant's efforts in terms of
rehabilitation and helping others are commendable, and the court
has thought seriously about the defendant's own statement, see
Def.'s Mem. in Supp., Ex. A (ECF No. 750-1), which is lengthy
and detailed.  Consequently, while the court concludes that the
need to protect society from the defendant is no longer as
significant as it was at the time of sentencing, the court
cannot quite conclude that there is no longer a need to protect
society from the defendant.  But in light of the defendant's
efforts in terms of rehabilitation, today the court places more
significant weight on the need for the sentence imposed to
reflect the seriousness of the offense than it does on the need
for the sentence imposed to protect the public from the
defendant.

While the defendant's commendable efforts in terms of
rehabilitation weigh in favor of his motion, the court must
consider all of the § 3553(a) factors.  Here, the most
significant § 3553(a) factor and the one that, in the court's
view, should be given the greatest weight is the need for the

20

sentence imposed to serve the purposes of sentencing, and the purpose on which the greatest weight should be placed at this time is the need for the sentence imposed to reflect the seriousness of the offense.

The defendant argues that "the criminal justice system [has] evolved.  Back then, the 'tough on crime' approach was at its zenith, the 100:1 crack ratio was in full force, and federal prison population was growing exponentially."  ECF No. 759 at 6.  However, it does not appear that the criminal justice system or society has evolved in terms of the fact that the crime of first-degree murder is viewed as a very grave offense, and the First Step Act did not change the penalties for that offense.

Looking at the entirety of the defendant's history and characteristics and his entire course of conduct over the years, the court concludes that a reduction of his sentence to less than life imprisonment would not result in a sentence that is sufficient to reflect the seriousness of his offense conduct—which was not simply first-degree murder nor simply a major drug offense.  The defendant's significant efforts in terms of rehabilitation and the other arguments advanced by him in support of his request for a sentence reduction are decisively outweighed by the need for the sentence in his case to reflect the seriousness of the offense.  In the court's view, the goal of having the sentence imposed reflect the seriousness of the

offense would be seriously undermined by reducing the
defendant's sentence to a sentence of less than life
imprisonment.

Accordingly, the court is denying the defendant's motion
for resentencing.

It is so ordered.

Signed this 9th day of February 2024 at Hartford,
Connecticut.

_____/s/AWT_____
Alvin W. Thompson
United States District Judge
